IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 95-cv-03174-WDM-MJW

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

SAMUEL L. BOYD,

      Defendant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND DIRECTION FOR ENTRY OF JUDGMENT**

---

Miller, J.

      This case was tried to the court over the period of nine days in November 2000, and

the parties ultimately submitted proposed findings and conclusions in mid-May 2001.[1] The

sole remaining defendant at trial was Samuel L. Boyd, who proceeds *pro se.* I have

---

[1]       I note the extreme delay in resolving this case is ultimately my responsibility. I observe, however, that there have been no filings or other communications from any party since January 2003. On two prior occasions, my staff and I attempted to work through the voluminous submittals but did not complete the review because of the press of other court business. With the reduced work load of senior status, we have now completed the review. That task was made extremely difficult by the parties' extensive filings, including Plaintiff's excessive submittals focusing on Robert Wilson's various activities rather than on the specific transactions in which Defendant Boyd played a role. Boyd's resubmitted proposed findings and conclusions were stricken on March 22, 2002, without prejudice to my consideration of some of the tendered materials. (Docket No. 330)

      Although the record may contain evidence sufficient to show securities violations by Boyd in other areas, for purposes of these findings and conclusions, I focus solely on his actions with regard to investments in Tri-Northern and the U.S. Treasuries trading program proposed to National Family Insurance Company and Darlene Kettleborough.

reviewed the trial transcripts and deposition testimony, as well as certain of the exhibits presented and evidence from the preliminary injunction hearing held before Judge John L. Kane in 1996.  These are the bases for the following findings and conclusions.

## **Findings of Fact**

### General Background

1.  Defendant Samuel L. Boyd (Boyd) is an attorney registered in the State of Texas. Boyd practices in Dallas through Boyd & Associates, P.C., a firm he owns.

2.  Boyd was not a credible witness at trial.  He was evasive in his manner of answering questions.  Further, he presented his role as an attorney as one of a puppet, doing and saying only what his client directed, and exercising no independent judgment. He tries to avoid responsibility for what he did, said or wrote, claiming he was just acting in his role as an attorney and on the instructions of his client.

3.  In late summer and early fall 1993, Boyd was searching for financing for a Russian satellite joint venture.  One of his business associates introduced him to Doug McClain (McClain) as a potential source of financing.  11/6/00 trial transcript at 74-79.[2]

4.  McClain was a board member and/or officer of Euro Scotia Funding Limited.  Wilson Vol. 1:69, 70.

5.  Although McClain was not able to provide the needed financing, he in turn introduced Boyd to Robert C. Wilson (Wilson).  11/6 Tr. at 74, 85.

---

[2]    Citations to trial transcripts will be to the date of the testimony (month and day) and the page number of the real time transcript, *e.g.* 11/6 Tr. at 74.  Citations to deposition testimony will be to deponent, volume (if more than one), and page number.

6.     Wilson was the founder of the Euro Scotia entities, including Euro Scotia Funding Limited and Euro Scotia Funding (USA).  Wilson also owned an interest in and/or controlled other companies, including Euro American Insurance Company, Badon International, Debenture Guaranty Corporation, and Advanced Medical Systems. Wilson Vol. 1:43, 45-47, 105.

7.     Wilson indicated to Boyd, beginning in late 1993, that he would raise the $800 million necessary for the satellite joint venture through a bond offering on the Luxembourg stock exchange.  11/6 Tr. at 85-86.

8.     The contact between Wilson and Boyd in 1993 was by telephone.  The men first met in Las Vegas in February 1994 when Wilson invited Boyd to attend a meeting of Euro Scotia entities.  11/6 Tr. at 139-140.

9.     Boyd's due diligence on Wilson and the entities proposed for involvement in the satellite joint venture bond offering was minimal.  11/6 Tr. at 89-96.

10.    In October or November 1993, both Boyd and his wife invested in the Wilson entity Tri-Northern, as hereafter described.

11.    In late 1993, Boyd's personal financial situation was precarious.  He faced a $285,000 balloon payment on the mortgage for his residence in Dallas at the end of October 1993, an amount he could not pay; the property was posted for foreclosure.  His law firm was also suffering financially.  11/6 Tr. at 87, 110-111.

12.    Boyd informed Wilson of his financial straits, ostensibly to be up front with Wilson in case Wilson could come through with financing for Boyd's satellite joint venture. 11/6 Tr. at 87.

13.    Although Wilson's promises of funding to Boyd for the satellite joint venture

3

extended at least through September 1994, Wilson ultimately provided no funding for the project.  11/6 Tr. at 110.

14.    In February 1994, Wilson proposed that Boyd represent him on a retainer basis.  He offered to pay Boyd $30,000 per month in exchange for 100 to 150 hours of legal work.  Boyd agreed.  11/6 Tr. at 140, 168.

15.    In April 1994, Wilson purchased the note and a deed of trust on Boyd's house, securing the note.  The note was for $285,000.  After the purchase, Boyd has not made any monthly house payments.  11/6 Tr. at 192.

16.    Neither Boyd nor Wilson appears to have kept formal records of the loans and advances paid by Wilson to Boyd or on his behalf.  11/6 Tr. at 193-194.

17.    Boyd has not repaid any money directly to Wilson, who may no longer hold the debts.  11/6 Tr. at 194-195.

18.    As an attorney for Wilson, Boyd did some limited work on a project with a company called Tensiodyne.  Boyd worked on a contract concerning a line of credit for Tensiodyne.  In the document, Wilson contracted to raise money for Tensiodyne by taking stock from the principals and using it to margin proceeds for further investment.  11/8 Tr. at 11-12.

19.    In March, April, or May 1994, as an attorney for Wilson, Boyd defended Wilson against allegations by the Canadian Imperial Bank of Commerce that Wilson had an overdraft with the bank of approximately $2.5 million.  11/6 Tr. at 173.

20.    Boyd was aware that the Royal Canadian Mounted Police was investigating Wilson's overdraft at the Canadian Imperial Bank of Commerce, but he declined to admit that he knew of check kiting fraud allegations against Wilson.  11/6 Tr. at 177-181.

21.     $2.6 million was paid to the Canadian Imperial Bank of Commerce in July 1994 from Boyd's attorney trust account at Nations Bank in Dallas.  11/6 Tr. at 180.

22.     In May 1994, as an attorney for Wilson, Boyd exchanged correspondence with Richard Cohen (Cohen), a California attorney, concerning claims by clients of Cohen that Wilson had defrauded them on a $300,000 loan fee.  11/6 Tr. at 183-184.

23.     Boyd received a June 1994 letter from Cohen that mentioned a CBS 60 Minutes broadcast from September 1991 alleging that Wilson was a scam artist.  11/6 Tr. at 189-190; Exhibit 557.

24.     Boyd did not investigate the 60 Minutes allegations because Wilson did not ask him to do so.  11/6 Tr. at 190.

25.     On Wilson's instructions, Boyd wired $50,000 to Cohen's clients, the Odenings, in May 1994.  11/6 Tr. at 186.

Tri-Northern

26.     Tri-Northern became the owner of a mining property in Sechelt, British Columbia. Wilson Vol. 1:73, 87.

27.     Wilson, through companies he owned, purchased shares in the property with the intention of taking the company public and beginning mining operations.  He bought a delisted public company (Hockey Hose), changed its name to Tri-Northern, and issued shares in the new company.  Wilson Vol. 1:73, 87.

28.     The Alberta Stock Exchange rejected the application to take Tri-Northern public.[3]

---

[3]     The Alberta securities commission issued an interim cease trade order to Tri-Northen (or its predecessor, Hockey Hose) on March 3, 1994, and a final cease trade order on March 17, 1994.  11/8 Tr. at 2; Exhibit 193.  Boyd testified he was not aware of these orders until the current litigation began.

Tri-Northern was defunct by 1997 at the latest.  Wilson Vol. 1:89, 101-102.

29.   In late 1993, Wilson and/or McClain offered to Boyd an opportunity to invest in Tri-Northern.  The offer was to purchase 100,000 shares at $3 per share.  11/6 Tr. at 111.

30.   McClain represented to Boyd that a company on the New York Stock Exchange had extended an offer to buy Tri-Northern out at $30 or $31 per share when it became publicly listed.  11/6 Tr. at 114.

31.   In November 1993, Boyd received some information concerning Tri-Northern from Michael Zwack (Zwack), an attorney in Canada working on the public listing project. 11/6 Tr. at 121.

32.   Boyd's wife, Delila, invested $55,000 of her own money to purchase Tri-Northern shares in October or November 1993.  11/6 Tr. at 120.

33.   Boyd did not have money of his own to invest in Tri-Northern.  Instead, he borrowed $300,000 from Monte Lund (Lund) and Jim Ritchie (Ritchie) in February 1994 to invest in Tri-Northern.  11/6 Tr. at 120.

34.   Lund testified at trial and was a credible witness.

35.   Boyd told Lund and Ritchie what he had been told about the Tri-Northern investment, including that the stock should be publicly traded soon. 11/6 Tr. at 125.

36.   The loan to Boyd for the Tri-Northern stock was a thirty-day loan; Boyd agreed to pay back $400,000 on the $300,000 loan after thirty days.  11/6 Tr. at 124.

37.   In the middle of March 1994, Wilson or McClain informed Boyd that there was a delay in the listing of Tri-Northern.  Wilson offered Boyd another 100,000 shares of Tri-Northern stock at $3 per share to help Boyd out more financially.  11/6 Tr. at

6

131-132.

38.  At the end of the thirty-day period of the first loan from Lund and Ritchie, Tri-Northern was not being publicly traded.  Boyd was in default on the loan by the first of April 1994.  11/6 Tr. at 130.

39.  Despite being in default on the first loan, Boyd borrowed another $300,000 from Lund and another lender to purchase another 100,000 shares of Tri-Northern from Wilson.  The terms of the second loan were similar to the first, obligating Boyd to repay $400,000 on the $300,000 loan.  This loan was for one year.  11/6 Tr. at 132-133; 11/20 Tr. at 24.

40.  Lund actually loaned Boyd $435,000 on the second loan.  The additional money was for Lund's own investment in Tri-Northern stock.  11/6 Tr. at 133-134.

41.  At some time, Lund had a telephone conversation with Boyd and Wilson (both Boyd and Wilson were on the telephone line) during which he was told that the Tri-Northern stock would be trading the week of April 25 but no later than the first week of May 1994.  11/20 Tr. at 27-29.

42.  Boyd told Lund the necessary documents had been provided to the Alberta stock exchange for the Tri-Northern listing.  11/20 Tr. at 32-34.

43.  In negotiations over the repayment of the first loan, Boyd, on advice from McClain and Wilson, agreed to pay a $2,200 per day penalty.  11/6 Tr. at 137.

44.  In a telephone conversation with Lund on April 30, Boyd stated there was enough money in his trust account to repay the loan, plus the penalty.  11/20 Tr. at 35.

45.  Wilson rescinded the first Tri-Northern transaction for Boyd, repaying $400,000 to Ritchie and Lund and taking back the first 100,000 shares purchased.  11/6 Tr. at

138; 11/20 Tr. at 41-42.

46.    Wilson also rescinded a portion of the second loan, taking back a percentage of the second stock purchase, but Lund was not fully repaid.  11/20 Tr. at 41-42.

47.    Problems arose on the listing of Tri-Northern when the Alberta securities commission halted trading until Tri-Northern, or its predecessor, filed required financial statements.  11/8 Tr. at 2-4.

48.    At Wilson's request, Boyd sent an April 22, 1994 letter to Zwack.  In the letter, Boyd represented that he held approximately $61 million worth of securities for the benefit of his client, Badon International.[4]  Boyd denied that this letter had anything to do with the relisting of Tri-Northern.  11/8 Tr. at 6.

49.    Boyd remained the owner of some Tri-Northern stock.  His wife also remained an owner.  They both lost their investments.  11/6 Tr. at 139.

50.    Lund lost his investment in Tri-Northern and, as a result, filed for bankruptcy.  11/6 Tr. at 139.

51.    Nevertheless, Lund did not believe Boyd intended to defraud him and believes instead that Boyd had a good faith belief he would make money on the Tri-Northern stock.  11/20 Tr. at 48.

52.    In May 1994, at Wilson's direction, Boyd sent a letter to Don Edel, a potential investor in Canada.  In that letter, Boyd represented that there were $61 million worth of marketable securities backing Euro Scotia.  11/8 Tr. at 39-40; 11/21 Tr. at

---

[4]     In a separate investment deal, Wilson acquired approximately 19 million shares of restricted stock in Tensiodyne, based on his offer to the officers of the company to trade on the stock and earn revenues for the company.  Boyd held the stock shares as trustee.  He estimated the value of the shares at around $3 per share.

68; Exhibit 116.

53.    Boyd also provided information about himself and Wilson to Fernando Cruz, a financial planner in New Jersey, who had clients interested in investing in Tri-Northern.  11/8 Tr. at 43-44.

54.    Boyd gave a copy of his resume to Jeff Crowley in June 1994 upon Crowley's request.  11/8 Tr. at 49.

55.    In September 1994, Boyd sent a letter to Crowley verifying the financial capabilities of Wilson's Euro Scotia's companies.  Exhibit 117; 11/8 Tr. at 50-51.

56.    At Wilson's request, Boyd authorized Crowley to send Boyd's September 1994 letter to Fernando Cruz.  11/8 Tr. at 52.

57.    In May 1994, Boyd was contacted by John DiFrances, a corporate consultant from Wisconsin who had invested in Tri-Northen in December 1993 or January 1994.  11/20 Tr. at 52, 59-60, 63.

58.    DiFrances testified at trial and was a credible witness.

59.    DiFrances learned of Tri-Northern through his brother-in-law, Mark Andre (Andre), who invested on an offer by Wilson and McClain.  DiFrances's nephew, Daniel Thompson (Thompson), also invested in Tri-Northern.  11/20 Tr. at 53, 61.

60.    DiFrances entered a second transaction with Wilson in March 1994 when he invested in a short term liquid account in bond stripping.  11/20 Tr. at 60-61.

61.    Both of DiFrances's investments with Wilson predated any contact between DiFrances and Boyd.  11/20 Tr. at 88-89.

62.    In May 1994, DiFrances asked Wilson to bring $20,000 out of his investment in the bond stripping cash account.  Wilson gave DiFrances Boyd's contact information,

telling him that Boyd handled the redemptions and actual transfers of money. Wilson assured DiFrances the money would be returned in under seven days. 11/20 Tr. at 61, 62.

63. DiFrances contacted Boyd regarding the withdrawal.  11/20 Tr. at 63.

64. When the money did not arrive as promised, DiFrances contacted Boyd to find out where it was.   Boyd assured DiFrances the money would arrive and shortly thereafter wired $15,000 to DiFrances.  11/20 Tr. at 64.

65. When DiFrances called about the remaining $5,000, Boyd informed him there had been a clerical error.  DiFrances registered concerns with Boyd and made several phone calls to him before the final $5,000 was paid over a month later.  11/20 Tr. at 64-65.

66. If DiFrances had not received his money back, he would have notified his relatives, Andre and Thompson, immediately to tell them there was serious trouble with Wilson and to take action.  11/20 Tr. at 66.

67. Andre was involved with Wilson on other transactions in which Wilson was purportedly providing financing for some of Andre's companies.  11/20 Tr. at 59, 67-68.

68. In late 1994, DiFrances became concerned about Wilson based on problems with the funding of Andre's companies and a job offer to Thompson to work for Euro Scotia that had never gone through.  11/20 Tr. at 67-68.

69. In November or December 1994, DiFrances began to distrust Wilson and to attempt to get his investments back.  11/20 Tr. at 69.

70. DiFrances and Andre met with Wilson, McClain, and an attorney (not Boyd) in mid-

January 1995. DiFrances learned the troubling information that Wilson had no prior experience with the bond issue he was doing for Andre's companies, despite his prior representations. DiFrances also learned that Wilson was in some serious financial difficulty. 11/20 Tr. at 69.

71.    At the January 1995 meeting, Wilson represented that he would pay out DiFrances, Andre, and Thompson within a week or two. Wilson put DiFrances in touch with Boyd to make that occur. 11/20 Tr. at 70.

72.    After the January 1995 meeting, DiFrances spoke with Boyd over the telephone. Boyd needed wire transfer instructions and was uncertain about the total amounts outstanding on DiFrances's investments. 11/20 Tr. at 70.

73.    Concerned about Wilson, DiFrances asked Boyd after the January 1995 meeting how well Boyd knew Wilson. Boyd answered that he knew Wilson well, that he had other business transactions with Wilson, and that Wilson had always met his obligations to the best of Boyd's knowledge. 11/20 Tr. at 75.

74.    When DiFrances had not received payment by April or May 1995, he asked Boyd for references for Wilson. Boyd responded that he could not or would not provide the references because there were many people seeking money from Wilson at that point, and calls to references would scare them, as well as potential investors, away. 11/20 Tr. at 72-73.

75.    In May 1995, Boyd sent a letter to Andre informing him that the money owed to Andre, DiFrances, and Thompson would come from a new Wilson company, Atlantic Debenture Guaranty. 11/20 Tr. at 73-74; Exhibit 365.

76.    Boyd made oral representations to DiFrances between January and June 1995 (and

11

earlier, in 1994, when DiFrances requested the $20,000 repayment).  Boyd led DiFrances to believe there were simply administrative problems with Wilson's investments.  11/20 Tr. at 150-151.

77.   Boyd also sent written representations to DiFrances, including a letter in which Boyd referred to the potential for Tri-Northern and to the fact that Wilson was prepared to rescind the transaction.  Boyd represented that the complaints against Wilson were from malcontents.  Exhibit 368; 11/20 Tr. at 146-147.

78.   DiFrances eventually received a check for $40,000, which bounced.  When he called Boyd about it, Boyd admitted he had sitting on his desk a bad check from Wilson for $75,000 for Boyd's law firm.  11/20 Tr. at 75-76.

79.   In late May 1995, DiFrances informed Boyd he felt fraud and criminal activity had been involved in Wilson's investments and told Boyd that if things did not work out soon he (DiFrances) had no choice but to go to the authorities.  11/20 Tr. at 76-77.

80.   Boyd responded, in a way that DiFrances interpreted as a threat, that Wilson would countersue for usurious interest or perhaps go to the authorities with claims that DiFrances had tried to blackmail Wilson.  11/20 Tr. at 77-78.

81.   Relying on Boyd's letters through May 1995, which DiFrances interpreted as a promise that investors would be repaid, DiFrances delayed his investigation of Wilson.  By early June 1995, DiFrances was actively gathering information to protect his rights.  11/20 Tr. at 120-121 123, 124.

82.   DiFrances became aware of a note from Badon to Tri-Northern in November or December 1994.  If he had known what Boyd knew, that the Badon note was the only real capital on the balance sheet and that the note was signed by Wilson's wife,

he would have sensed something was wrong and would have contacted the directors and officers at Tri-Northern for an explanation of the company's situation. 11/20 Tr. at 130-131.

83. DiFrances was not told by Boyd that the problems with the Tri-Northern relisting were tied to the Badon note and to Wilson's bad checks written to the Canadian Imperial Bank of Commerce. 11/20 Tr. at 151-152.

84. Boyd never disclosed to DiFrances that Boyd sent a letter to the Alberta Stock Exchange on Wilson's behalf trying to guarantee the collectability of the Badon note. 11/20 Tr. at 154.

85. Boyd's actions led DiFrances to believe that Wilson was a legitimate businessman with legitimate businesses, that Wilson was not in trouble, and that there was a bond stripping program (which apparently did not exist). 11/20 Tr. at 155-156.

86. DiFrances lost approximately $80,000 to Wilson on his investments. 11/20 at 83.

87. DiFrances and others filed lawsuits against Boyd and Wilson in 1997 following a long investigation, but the suit against Boyd was eventually dismissed when it became apparent there was no money to satisfy any potential judgment. 11/20 Tr. at 81-83.

88. Bok Pon invested in Tri-Northern through Fernando Cruz. 11/21 Tr. at 4.

89. Pon testified at trial and was a credible witness.

90. Before investing, Pon requested financial statements and auditing reports. Cruz informed him there would be an Initial Public Offering (IPO) within a few months and offered the Tri-Northern stock at $3 per share with a guaranteed buy-back price of $3.50 per share. 11/21 Tr. at 5.

91.  Cruz informed Pon that the money for the Tri-Northern shares would be sent to a trustee, Boyd, who would hold onto the money until the shares were distributed. 11/21 Tr. at 6-7.

92.  Pon asked for and received a copy of Boyd's resume.  11/21 Tr. at 7.

93.  Pon called Boyd several times before investing in Tri-Northern.  In the first phone call, Boyd confirmed that he was the trustee who would hold the money on the investment.  11/21 Tr. at 9.

94.  During one of the phone calls between Boyd and Pon, Boyd mentioned the buy-back.  11/21 Tr. at 12.

95.  Pon received from Cruz a copy of a letter Boyd had written to another investor claiming to hold more than a million dollars of security.  Exhibit 116.  Pon relied on this as evidence that Tri-Northern had the funds to buy back his stock purchase. 11/21 Tr. at 20-21.

96.  On August 28 or 29, 1994, Pon transferred $504,000 to Boyd's trust account at Nations Bank in Dallas.  Pon was purchasing Tri-Northern stock on behalf of his two sons.  11/21 Tr. at 16.

97.  Pon received a confirmation from Boyd that the money had been deposited into the trust account.  11/21 Tr. at 17; Exhibits 133, 134.

98.  Pon eventually requested that Wilson buy back all of Pon's Tri-Northern stock.  Cruz persuaded Pon to wait a little longer for the IPO, but Pon still wanted Wilson to buy back half his investment.  11/21 Tr. at 21-22.

99.  Wilson told Pon an overseas electronic transfer had lost the money.  11/21 Tr. at 22.

100.  Pon never received any Tri-Northern stock or any of his money back.  11/21 Tr. at

24, 27.

101.  Pon never authorized Boyd to use any of Pon's investment to pay Wilson's bills. 11/21 Tr. at 77.

102.  Boyd did not tell Pon of his own problems with his investment in Tri-Northern.  This information would have been extremely important to Pon.  11/21 Tr. at 26.

103.  Pon lost $504,000.  11/21 Tr. at 27.

104.  Several years later, after this litigation began, Boyd called Pon and tried to persuade him that Boyd had never mentioned he was a trustee.  11/21 Tr. at 27.

105.  Boyd's role as an attorney and as the holder of the trust account caused several investors, including Crowley and Cohen, to feel comfortable investing with Wilson.

106.  Boyd's actions and statements, including his representations of his role as an attorney and his use of the attorney trust account, enabled Wilson to defraud multiple investors.

### U.S. Treasuries Trading Program

107.  Robert (Bob) and Sandra Erwin were the founders of National Family Life Insurance Company (NFC), a Texas insurance company.

108.  Sandra Erwin testified at trial and was a credible witness.

109.  The Erwins invested their personal money in Tri-Northern and Wilson's Advanced Medical Management Systems company.  11/8 Tr. at 79.

110.  Boyd met Bob and Sandra Erwin in March 1994.  11/8 Tr. at 59-60.

111.  Boyd was asked to be the escrow holder for a purchase order transaction between Bob Erwin and Greg Freeman.  11/8 Tr. at 59-60.

112.  On May 10, 1994, at Wilson's request, Boyd sent a letter to Hector DeLeon

(DeLeon), the attorney for NFC, with a copy to Bob Erwin, proposing an investment opportunity with Wilson. 11/8 Tr. at 62-64; Exhibit D174.

113. At the time Boyd sent the May 10,1994 letter to NFC, he was aware of the claims of fraud against Wilson asserted by the Odenings (Richard Cohen's clients). 11/8 Tr. at 73-74.

114. On May 12, 1994, Boyd met with Wilson, Bob and Sandra Erwin, DeLeon, Clyde Tullis (Tullis), NFC's president, and others in Dallas for a meeting on the proposed investment program. 11/21 Tr. at 87.

115. Tullis testified at trial and was a credible witness.

116. Boyd's role at the May 12, 1994 meeting was as Wilson's attorney. He furnished some financial information and verified that if NFC entered the investment program, its money would be safe. 11/22 Tr. at 143.

117. Boyd represented that the program could work if his trust account was used. He stated he would be the safe keeper of the funds until collateral was posted. 11/22 Tr. at 146-147.

118. From NFC's perspective, Boyd's role in the investment protocol was to act as the trustee through whom the money was going to be funded. He was also to act to help and facilitate the protocol. Boyd also prepared the note documents and other documents. 11/22 Tr. at 131-132.

119. Boyd learned during this litigation that North American Technologies later had to restate its financials because the Wilson Tensiodyne investment turned out to be false. 11/8 Tr. at 89.

120. Wilson's proposal to NFC involved a complicated scheme in which NFC would

16

deposit money into an account held by Boyd as trustee for Euro American Insurance Company (EAIC), a Wilson-controlled company. Wilson would then collateralize the funds with U.S. treasuries and leverage and trade the treasuries to make a profit to be shared by NFC and Wilson. 11/8 Tr. at 68.

121. Boyd represented EAIC in specific instances. 11/6 Tr. at 150.

122. At the May 12 meeting, Wilson produced an audited financial statement for EAIC showing that the company had approximately $250 million of unassigned surplus. 11/21 Tr. at 91-92.

123. Tullis, NFC's president, saw the EAIC financial statement at the May 12 meeting. If he had known then that the EAIC statement was false, he would have requested more due diligence on Wilson than he did. NFC's due diligence on Wilson was not as thorough as it should or could have been. 11/21 Tr. at 95.

124. Wilson proposed that NFC use the Mark Twain Bank in St. Louis. 11/21 Tr. at 107-108.

125. Wilson had prior dealings and connections with Jack Kenny, a broker at Pauli & Company in St. Louis. 11/21 Tr. at 108.

126. NFC was to make a collateralized loan to EAIC. The money was to be placed in the Mark Twain Bank and then moved to Pauli & Company. 11/21 Tr. at 108-109.

127. NFC's money was later transferred to a Pauli & Company account at Bear Stearns, a clearing house. 11/21 Tr. at 112-113.

128. Bob and Sandra Erwin opened separate accounts at Pauli & Company to transfer some personal money (IRAs) to invest with Wilson to get the greater return promised by Wilson. 11/21 Tr. at 111.

17

129.   Boyd was the trustee for an account for EAIC at Pauli & Company in St. Louis.  11/8 Tr. at 16-19.

130.   NFC asked Boyd for a list of past investors with Wilson who could vouch of the effectiveness of his investments.  Boyd did not provide such a list.  11/8 Tr. at 70, 113-114.

131.   In the afternoon of May 12, 1994, Boyd met with Tullis and DeLeon to discuss the structure for the guaranteed notes between Euro American Insurance Company and NFC.

132.   Boyd drafted at least the first four guaranteed notes, irrevocable instructions, and letters of credit.  11/8 Tr. at 98-99.

133.   The first guaranteed note, dated May 26, 1994, was for $4 million.  11/8 Tr. at 98.

134.   The second guaranteed note, signed June 2, 1994, was for $800,000.  11/8 Tr. at 105.

135.   The third guaranteed note was prepared June 14, 1994.  It was signed by McClain and was for $6.4 million.  11/8 Tr. at 106-107.

136.   The fourth guaranteed note, prepared in July 1994, was for $11.2 million.  11/8 Tr. at 108.

137.   The guaranteed notes rolled over every ninety days. 11/8 Tr. at 105.

138.   Boyd never checked to see if NFC was funding the notes.  11/8 Tr. at 109-111.

139.   On July 22, 1994, NFC transferred $5 million from its account at Town North Northern Bank to Boyd's attorney trust account at Nations Bank in Dallas.  11/8 Tr. at 115-116.

140.   Boyd was aware of the wire transfer within a few days of July 22, 1994, but did not

18

contact anyone about it.  11/8 Tr. at 116-118.

141.    Further transfers from NFC to Boyd's trust account occurred on August 22, 1994 ($800,000), September 6, 1994 ($1.2 million), October 20, 1994 ($1.2 million), and October 26, 1994 ($230,426).  11/8 Tr. at 119.

142.    NFC also transferred securities, including two $600,000 treasury notes and a $1,000,000 treasury note to collateralize the loans to Wilson and Euro Scotia entities.  11/21 Tr. at 114-115.

143.    NFC gave the due diligence aspects to the Wilson program to DeLeon, its attorney. DeLeon encountered difficulty in getting documents on investors, Wilson and his companies, and the described returns.  DeLeon wrote a number of letters to NFC informing it that he was unable to accomplish what it had asked him to do.  11/21 Tr. at 112.

144.    As of June 30, 1994, NFC had moved $7,700,000 in money and securities to an account at Pauli & Company.  11/21 Tr. at 117; Exhibit 2.

145.    In July 1994, NFC's account at Pauli & Company started having margin transactions taking place in it.  11/21 Tr. at 118-119.

146.    The margin activity was significant for NFC because the company could only claim the actual value of the security in a margined account and not the value of the entire account.  This affected the admitted or nonadmitted assets of the insurance company.  As a result of the margining of the account, it would no longer be considered a valid investment by the Texas Department of Insurance.  11/21 Tr. at 118-119.

147.    NFC needed valid assets to offset its liabilities in order to remain solvent, so the

change in account status was important.  11/21 Tr. at 119.

148.   When Tullis learned there was margin trading going on, he informed Bob and

Sandra Erwin and William Neal (Neal).  Mr. Erwin or Neal called Wilson and Jack

Kenny (Kenny) to explain the problem.  Tullis was present during the phone call to

Wilson, who responded that he did not know margin trading would be a problem but

that he would check into it and get it stopped.  Kenny also responded that he would

check into it and get back to them.  11/21 Tr. at 141.

149.   Margin trading continued throughout July 1994.  11/21 Tr. at 141; Exhibit 2A.

150.   No one at NFC was doing the margin trading in the account.  11/21 Tr. at 142.

151.   Tullis had a couple of conversations with Wilson in July about the margin trading.

11/21 Tr. at 142.

152.   Wilson later said there was a problem with margin trading in the account and that

the money needed to be moved back from Pauli & Company and into Boyd's trust

account.  Wilson said this would remove the money from Pauli & Company and

blamed Kenny for the margin trading.  11/21 Tr. at 143.

153.   Tullis requested the money to be transferred from Pauli & Company to Town North

National Bank (NFC's bank account in Dallas) and then immediately wired to Boyd's

trust account at Nations Bank.  These transfers are reflected in Exhibit 35.  11/21

Tr. at 144.

154.   Tullis received confirmation that the money had been transferred into Boyd's

account.  11/21 Tr. at 145.

155.   These transfers occurred around July 22, 1994.  11/21 Tr. at 145.

156.   There were seven or eight transfers to Boyd's account from July 22, 1994, through

20

October 26, 1994.  1/21 Tr. at 146-147; Exhibits 35, 61.

157. Approximately $9.6 million was transferred to Boyd's trust account.  11/21 Tr. at 147.

158. The next collateralized note and investment package executed by NFC and EAIC after the July 20, 1994 note would have been in early October 1994.  11/21 Tr. at 148.

159. Exhibit 222 is a guaranteed note in the principal amount of $10,809,115.00, executed October 1, 1994, with a due date of December 30, 1994.  The note was executed by EAIC in favor of NFC.  11/21 Tr. at 149.

160. Tullis had a meeting with Wilson on September 28, 1994.  At that time Tullis told Wilson it was time for him to pay off the prior note by putting money back into treasuries.  Wilson said he had already taken care of it, that he placed money in Pauli & Company which was buying treasuries to put into NFC's cash account. 11/21 Tr. at 150.

161. At the end of September 1994, Tullis had a rough understanding that the Wilson investment protocol was working and that the loan was going to be paid off as of September 29.  At trial, he understood that this was all fabrications.  11/21 Tr. at 151.

162. In November 1994, Tullis was informed by Pauli & Company that a banking or wiring instruction error had occurred.

163. In the October 1994 time frame, Wilson was in daily contact with Bob Erwin trying to assure Erwin and Tullis (when Tullis was part of the conversations) that the money he had was correct and in the investment program and that the money that

21

had been wired was back in his possession (in Pauli & Company) despite the banking error.  11/22 Tr. at 4.

164.   When Tullis received the Bear Stearns statements in early October, the wire did not show up.  Wilson stated that it was a banking error and that the money was at Pauli & Company.  11/22 Tr. at 5.

165.   Tullis requested a reconciliation of his account from Pauli & Company; Tullis reconciled the account himself and found what the account should have; he requested a letter from Pauli & Company on that basis.  11/22 Tr. at 5-6.

166.   On October 18, 1994, Kenny, the account manager at Pauli & Company, wrote a letter stating that NFC, as of September 30, should have had roughly $10.6 million in securities in its account.  11/22 Tr. at 6; Exhibit 60.

167.   The letter from Kenny confirmed Wilson's statements that he had wired the money into the account.  Tullis did not have any reason to disbelieve the letter when it arrived, but the money had not shown up in the Bear Stearns account.  11/22 at 7.

168.   Tullis received Exhibit 64, a November 15, 1994 letter from Kenny showing the market value of the securities and that errors had caused the margins of the securities on the account.  Tullis also received a letter from a Peter Dale (the second page of exhibit 64) apologizing for the margin activity and stating that the activity should have been in another account.  11/22 Tr. at 7-8.

169.   Tullis needed the letter that is exhibit 64 to file his quarterly return with the Texas Department of Insurance.  11/22 Tr. at 9.

170.   Tullis received an unsolicited letter from Wilson in December 1994 mentioning securities that were being held and would be placed back in Tullis's account as of

December 30, 1994.  11/22 Tr. at 10.

171.   In the first part of December 1994, Tullis was under the impression that Wilson had the money and the investment protocol was being handled and processed.  11/22 Tr. at 10.

172.   Tullis also received a verbal confirmation from Wilson about the amounts that would be placed in the account as of the end of the year.  11/22 Tr. at 11.

173.   Tullis and Bob Erwin were happy when they received a letter from Kenny advising NFC that as of December 30, $11.4 million of U.S. treasuries would be in the accounts.  11/22 Tr. at 11; Exhibit 79.

174.   The information from Kenny meant that the entire collateral loan would be paid back and that NFC would have its money back as a cash account as of the end of the year (so there would not be a collateral loan).  11/22 Tr. at 12.

175.   At the end of December 1994, Tullis was preparing an annual statement for NFC to file with the Texas Department of Insurance.  Tullis relied on the statements he was getting from Pauli & Company and Bear Stearns.

176.   In January 1995, Tullis received a fax from Kenny with a breakdown of principal and interest of the $11.4 million that was placed in the account as of the end of December 1994.  11/22 Tr. at 15; Exhibit 4.

177.   After Tullis received Exhibit 4, he also received a margin call from Pauli & Company or Bear Stearns; the margin call essentially said that NFC had margin securities in its account and that their value had reduced by an amount so that NFC needed to put up more money to continue to hold the securities.  11/22 Tr. at 16-17.

178.   Exhibit 2A is the account statement showing the margin call.  It reflects that the NFC

account, instead of having a value of over $11 million, only had a value of about $1 million.  Page 11586.  11/22 Tr. at 17.

179. The effect of the margin call and the statement was that NFC was insolvent.  11/22 Tr. at 18.

180. After learning of the margin call, Tullis informed Bob Erwin of the problem; Erwin went to Wilson to try to find out what happened to the actual purchase of the $11 million.  Wilson claimed a banking error again and asked for some time to check into the situation.  11/22 Tr. at 18.

181. In January 1995, Wilson or Kenny wired the $1 million out of the NFC account.  No one at NFC authorized the wire.  11/22 Tr. at 18.

182. Wilson provided a note from Euro Scotia Funding in the amount of $9.9 million.  The note was dated December 6, 1994, and was due March 30, 1995.  11/22 Tr. at 20-21; Exhibit 6.

183. In his year-end filing with the Texas Department of Insurance (as of 12/31/94, but filed by end of February 1995), Tullis stated (based on Exhibit 6) that NFC had a collateral loan in the amount of over $9 million.  11/22 Tr. at 24-25.

184. In February 1995, Wilson offered some checks that would purportedly pay off the December 6, 1994 Euro Scotia Funding note.  The checks were worthless, and the note was rolled over into another note signed by a Wilson entity; this note, due in June 1995, was also paid with bad checks.  11/22 Tr. at 25.

185. NFC began making efforts to get its investments repaid in December 1994.  It was put off by claims of problems (on the part of Wilson).  11/22 Tr. at 27.

186. Bob Erwin died May 11, 1995.

187.   In August or September 1995 NFC went to Johnston Kent demanding the collateral behind a note and learned then that its money was gone.  11/22 Tr. at 28.

188.   After her husband's death, Mrs. Erwin called the note and went to Johnston and Kent to pick up the treasuries.  She was told that the treasuries had been released to Wilson in February 1995.  11/22 Tr. at 152.

189.   NFC lost $9.6 million of its initial investment.  The company became insolvent until Mrs. Erwin funded it with proceeds of her husband's life insurance policy.  11/22 Tr. at 152.

190.   The Erwins lost $2.2 million on their personal investments with Wilson.  11/22 Tr. at 152-153.

191.   NFC backdated several documents to be able to show a loan package for its 1994 annual statement to the Texas Department of Insurance.  This was not proper. 11/27 Tr. at 48.

192.   In late June 1994, Boyd received $153,000 from Darlene Kettleborough, Greg Freeman's mother, to invest in a collateral investment program with Wilson similar to the one NFC invested in.   Boyd prepared the investment note for Mrs. Kettleborough.  11/28 Tr. at 85-86.

193.   Boyd was aware that the funds from Mrs. Kettleborough were not a personal loan to Wilson.  11/28 Tr. at 85.

194.   Boyd claimed that he had started a separate ledger for Mrs. Kettleborough's investment; the ledger was never produced.  11/28 Tr. at 86.

195.   At the time Boyd received Mrs. Kettleborough's investment of $153,000, the balance in his trust account was $35,343.  Exhibit 1002, p. 10; 11/28 Tr. at 87.

196.   On July 1, 1994, one day after Mrs. Kettleborough's money was deposited in Boyd's trust account, $45,000 was paid out of that account to Lloyd Eisenhower. 11/28 Tr. at 87.

197.   On July 5, 1994, five days later, $80,000 was paid from Boyd's trust account to Ann Eisenhower. 11/28 Tr. at 87.

198.   Boyd claimed not to have any firsthand knowledge of what happened to Mrs. Kettleborough's money after it was deposited in his trust account. 11/28 Tr. at 87-88. Boyd testified that he knew only what he had been told by Wilson and Greg Freeman. *Id.*

<u>Selected Transactions from Boyd's Trust Account</u>

199.   Days after Boyd received $5 million from NFC into his trust account at Nations Bank, he used a portion of that money to pay $2.6 million on Wilson's behalf to the Canadian Imperial Bank of Commerce. 11/28 Tr. at 83.

200.   From investor funds paid into his trust account, Boyd also paid a $267,228 American Express bill for Wilson. 11/28 Tr. at 84.

201.   After receiving the $504,000 from Pon for the purchase of Tri-Northern shares, Boyd paid $185,000 of that money for Wilson's jet. 11/28 Tr. at 91-92.

<u>Monies Paid to, for, or by Boyd</u>

202.   Part of the ongoing scheme was to deposit funds into Boyd's trust account that were later used for purposes other than investments. From September 22, 1994, until June 30, 1995, $9,755,486 was deposited into Samuel Boyd PC Trust Nation's Bank Texas. Exhibit 1003. The major disbursements from this account during the same

time period included:  $2,600,000 to the Canadian Imperial Bank of Commerce; $602,661 to Euro Scotia funding; $352,750 to Edward Canino; $370,000 to Air Castle Inc.; $830,228 to American Express, and $461,202 to Samuel Boyd.

203. A detailed statement of payments to accounts not controlled by defendant Boyd is set forth in Plaintiff's Exhibit 1017.

204. Payments to Boyd or entities he controlled are summarized in Plaintiff's Exhibit 1022, which indicates that there were payments to a Boyd entity and/or cash withdrawals by Boyd in a total amount of over $600,000.  The exhibits, however, fail to distinguish in understandable fashion between income and disbursements related to defendant Boyd and his wife's legal practices and individual investments and those related to any other purpose.

205. There is evidence that the Boyd firm incurred expenses related to the ongoing legal practice, including costs of lawsuits brought by unhappy investors.  *See* 11/28 Tr. at 36-38.

206. Plaintiff's financial analyst, Charles Chaney, was unable to explain the purpose of the receipts and disbursements in the Boyd accounts or identify the owner or beneficiary thereof.  11/9 Tr. at 44 *et seq.*  As to these amounts, I find that there is insufficient evidence for me to conclude that any particular item represents profits or other ill-gotten gains that should be disgorged.

207. As part of the ongoing relationship between Wilson and Boyd, Wilson provided Boyd a $285,000 direct benefit by purchasing Boyd's house note and never requiring repayment.  *See* Finding 15 above.  Wilson also provided a $400,000 direct benefit to Boyd by paying Boyd's loan due Ritchie and Lund.  *See* Finding 45 above.

27

## Conclusions of Law

1.   I have jurisdiction over this SEC enforcement action pursuant to 15 U.S.C. § 77v(a)

and 15 U.S.C. §§ 78u(e) and 78aa.

2.   The SEC alleges that Boyd's conduct with respect to investors in Wilson's Tri-

Northern and treasury schemes violated Section 17(a) of the Securities Act of 1933,

15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.

§ 78j(b), and Rule 10b-5, promulgated under the 1934 Act, 17 C.F.R. § 240.10b-5.

The text of these statutes and rule are footnoted here.[5]

---

[5]      Section 77q(a) provides:
(a) Use of interstate commerce for purpose of fraud or deceit

It shall be unlawful for any person in the offer or sale of any securities or
any security-based swap agreement . . . by the use of any means or
instruments of transportation or communication in interstate commerce or
by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement
of a material fact or any omission to state a material fact necessary in
order to make the statements made, in light of the circumstances under
which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business
which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 78j provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any
means or instrumentality of interstate commerce or of the mails, or of any
facility of any national securities exchange– . . .

(b) To use or employ, in connection with the purchase or sale of
any security registered on a national securities exchange or any security
not so registered, or any securities-based swap agreement . . . any
manipulative or deceptive device or contrivance in contravention of such

3.  "To establish a Section 10(b) and/or Rule 10b-5 violation, the SEC must prove the following: '(1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, and (4) use of the jurisdictional means.'" *United States Securities and Exchange Comm'n v. Maxxon, Inc.*, 465 F.3d 1174, 1178 (10th Cir. 2006) (quotation omitted).

4.  Essentially the same elements are required under Section 17(a). *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2nd Cir. 1999).[6]

5.  Each of these elements is met on the facts of this case.

6.  Boyd made a number of material misrepresentations, including:

    a.  his confirmation to Pon that he was trustee of the investor funds;

    b.  his statements to Lund regarding the "imminent" relisting of Tri-Northern;

---

rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[6]     No scienter is required to prove violations of Section 17(a)(2) or (a)(3). *Aaron v. S.E.C.*, 446 U.S. 680, 701-702 (1980).

    c.     his letter to Don Edel stating that he held $61 million in marketable securities for Wilson and/or Wilson entities;

    d.     his statements to NFC that the proposed investment could work since the money would be safe in his attorney trust account; and

    e.     his statements to NFC and other investors that Wilson was a legitimate businessman with the means to cover rescission of investments.

7.    Boyd failed to disclose to investors that investor funds were not being invested as promised and that funds sent to Boyd's attorney trust account were being used to pay Wilson's personal expenses, as well as to pay obligations to prior investors.

8.    Boyd's statements to Pon, Lund, and NFC, among others, were made in connection with the purchase or sale of a security.  Both Pon and Sandra Erwin testified that Boyd's representations of the safety of his attorney trust account were instrumental, or material, in their decisions to invest with Wilson.  *See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971) (crux of case was that investor suffered an injury as a result of deceptive practices touching sale of securities; facts fell within reach of section10(b)).

9.    Both Section 10(b) and Section 17(a) require the use of means or instruments of transportation or communication in interstate commerce or the use of the mails. Boyd's conduct in using the mails, the telephone, and wire transfers satisfy these requirements.  *See, e.g., Alley v. Miramon*, 614 F.2d 1372, 1379 (5th Cir. 1980) (intrastate use of telephone); *U.S. v. Kroh*, 915 F.2d 326 (8th Cir. 1990) (wire transfer).

10.    As an attorney, Boyd is not exempt from the reach of the securities laws.  An

attorney "who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a security purchaser." *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 267 (6th Cir. 1998) (citation omitted).

11.   "[W]hile an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the financial condition of his client, he assumes a duty to provide complete and nonmisleading information with respect to subjects on which he undertakes to speak." *Id.* at 268 (citation omitted).

12.   Although silence, absent a duty to disclose, is not a basis for a securities violation, Boyd's affirmative statements to various investors gives rise to liability on the circumstances of this case.  I include here Boyd's statement to Pon that he was the trustee for the investment money and Boyd's statements to Lund concerning the relisting of Tri-Northern.  *Id.* at 267.

13.   Thus, Boyd had an obligation not to make misstatements or omissions when he undertook to speak to investors.  *Id.* at 267-68.

14.   Boyd's statements and letters to particular individuals are also the basis for liability where the statements foreseeably reached the hands of other potential investors. *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996).

15.   It was reasonably foreseeable that Boyd's representations concerning Wilson's legitimacy and investment sophistication and concerning the use of Boyd's trust account to hold purchase monies would be used in connection with the offer or sale of a security.  Accordingly, those representations violated the securities laws.  *Id.*

31

16. Boyd's statements and omissions in his dealings with Wilson's investors constitute "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers . . . that is either known to [Boyd] or is so obvious that [Boyd] must have been aware of it. *Id.* at 1232 (citation omitted).

17. As such, this conduct qualifies as recklessness sufficient to create liability under the securities laws. *Id.*

18. Because Boyd's conduct was in violation of the federal securities laws, Texas state law, to the extent it is contrary to federal law, does not apply. *See Kamen v. Kemper Financial Servs., Inc.*, 500 U.S. 90, 98 (1991); *Burks v. Lasker*, 441 U.S. 471, 479 (1979).

19. Boyd's deceptive practices touching the purchase or sale of a security and his representations made to induce or influence a purchase or investment decision were "in connection with" the offer or sale of securities. *United Int'l Holdings v. Wharf Ltd.*, 210 F.3d 1207, 1221 (10th Cir. 2000).

20. Boyd's conduct was reckless and satisfies the *scienter* requirement of the securities laws. *Hackbart v. Holmes*, 675 F.2d 1114, 1117 (10th Cir. 1982), abrogated on other grounds by *Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1441-42 (10th Cir. 1991).

21. Boyd's deliberate avoidance of actual knowledge also satisfies the *scienter* requirement of the securities laws. *United States v. Lee*, 54 F.3d 1534, 1538 (10th Cir. 1995).

22. Having found violations of the federal securities laws, I have broad equitable power to fashion appropriate remedies, including ordering that Boyd disgorge his profits.

32

23. The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws. *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2nd Cir. 1996).

24. Disgorgement also supports the deterrence effect of SEC enforcement actions. *Id.*

25. I have broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged. *Id.*

26. The amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation. Any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty. *Id.* at 1475.

27. Where benefits result from both lawful and unlawful conduct, the party seeking disgorgement must distinguish between the legally and illegally derived profits. *See, e.g., SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2nd Cir. 1971); *SEC v. Wills*, 472 F. Supp. 1250, 1276 (D.D.C. 1978).

28. Plaintiff has proved by a preponderance of the evidence that Boyd derived a direct benefit or profit by means of Wilson's payments of Boyd's loans. Accordingly, Boyd should be ordered to pay disgorgement in the amount of $685,000, consisting of $285,000 for the mortgage and $400,000 for rescission of the Tri-Northern investment, together with postjudgment interest. Plaintiff has not met its burden of proof regarding the balance of its claim for disgorgement.

29. Boyd should be enjoined from further violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5.

30.     Injunctive relief is "appropriate if the SEC demonstrates a reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities laws in the future." *SEC v. Pros Intern, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993). *See also* 15 U.S.C. §§ 77t(b), 78u(d)(1).

31.     I am vested with wide discretion when an injunction is sought to prevent future violations of the securities laws. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2nd Cir. 1976).

32.     Factors I may consider in determining whether to grant injunctive relief include "the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." *SEC v. Pros Intern*, 994 F.2d at 769.

33.     The violations at issue before me are quite serious.  Multiple investors lost millions of dollars, and many of those lost investments were funneled through Boyd's trust account.

34.     I find a high degree of scienter here.  Although Boyd denies knowing the fraudulent nature of Wilson's schemes, his claims are not credible in light of his actions.  At the same time he was informing investors like Bok Pon that his investment would be safe in the attorney trust account, he was paying those funds out to Wilson for personal expenses.

35.     Boyd's occupation as an attorney clearly presents opportunities for future violations.  Indeed, Boyd's role in the transactions at issue before me was as an attorney who abused the trust that investors placed in him because of his occupation.

34

36.   Boyd has not recognized his wrongful conduct, nor does he give me any assurance against future violations.  Throughout this case and at trial, Boyd has maintained that he should not be held liable for merely following Wilson's directions, even where it was obvious that those directions constituted violations of the securities laws.

37.   Considering each of these factors, individually and collectively, I conclude there is substantial likelihood that Boyd will commit future violations of the securities laws if not permanently enjoined.  *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 814 (2nd Cir. 1975).

38.   The violations at issues here are not the result of an isolated incident.  Rather, Boyd's involvement with Wilson's schemes extended over a period of several years, included multiple violations of the securities laws, centered around his occupation as an attorney, and impacted numerous victims.  Accordingly, injunctive relief is justified.

39.   I may award a civil penalty for these violations.  15 U.S.C. §§ 77t(d), 78u(d)(3)(A). The amount of any penalty awarded should be determined "in light of the facts and circumstances" of the particular case.  § 78u(d)(3)(B)(i).  A three-tier system of penalties is established, depending upon the conduct and amount of loss.  I conclude Boyd's violations involved circumstances of "fraud, deceit, manipulation, or deliberate or reckless disregard of regulatory requirements," and resulted directly or indirectly in substantial losses, millions of dollars in the case of NFC.  Accordingly, a penalty of up to $100,000 is authorized.  § 78u(d)(3)(B)(iii).

40.   Under the circumstances of this case, including the fact that Wilson was assessed the maximum penalty of $100,000 (see May 12, 1999 Order, Docket No. 231), I

35

conclude the appropriate penalty for Boyd is $50,000.

41.     The decision to grant prejudgment interest (and the choice of the rate) is a matter confided to my broad discretion.  In so deciding, I should consider: (i) the need to fully compensate the wronged party for the actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.  In enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance.  *SEC v. First Jersey Securities, Inc.*, 101 F.3d at 1476.

42.     Although I am cognizant of the need to compensate the investors who lost money in Wilson's schemes, I am persuaded that prejudgment interest should not be awarded in this case given the unusual amount of time that has passed since the trial.

### Conclusion

Based on the foregoing findings and conclusions, I direct that judgment shall enter in favor of Plaintiff Securities and Exchange Commission and against Defendant Samuel L. Boyd as follows:

1.     Final judgment shall enter against Defendant Samuel L. Boyd in the amount of $685,000 for disgorgement and $50,000 in penalties, for a total of $735,000.00, with no prejudgment interest.

2.     Defendant Samuel L. Boyd, his agents, servants, employees, attorneys, successors and assigns who receive actual notice of this Order and the resulting Judgment are permanently enjoined from violating Section 17(a) of the Securities Act of 1933 [15

U.S.C. § 77q(a)] by, directly or indirectly, in the offer or sale of securities of any issuer through the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails:

A.      Employing any device, scheme or artifice to defraud; or

B.      Obtaining money or property by means of any untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

C.      Engaging in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser or prospective purchaser of any such security.

3.      Defendant Samuel L. Boyd, his agents, servants, employees, attorneys, successors and assigns who receive actual notice of this Order and the resulting Judgment are permanently enjoined from violating Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by, directly or indirectly, in connection with the purchase or sale of any securities of any issuer, through the use of any means or instrumentalities of interstate commerce or of the mails, or any facility of any national securities exchange:

A.      Employing any device, scheme or artifice to defraud; or

B.      Making any untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading; or

C.      Engaging in any act, practice or course of business which operates or would

operate as a fraud or deceit upon any person.

4.      Plaintiff may have postjudgment interest and its costs according to law.

DATED at Denver, Colorado, on July 21, 2011.

BY THE COURT:

s/ Walker D. Miller
United States District Judge