IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 95-cv-03174-MSK-MJW

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

SAMUEL L. BOYD,

        Defendant.

_____

### OPINION AND ORDER GRANTING, IN PART, MOTION TO ALTER JUDGMENT
_____

**THIS MATTER** comes before the Court pursuant to the Plaintiff Securities and Exchange Commission's ("SEC") Motion to Amend Judgment **(# 354)** to omit certain statements in the Judgment with regard to Defendants against whom claims were voluntarily dismissed, to which no responsive papers have been filed[1]; and Defendant Boyd's Motion to Vacate **(# 359,** as modified **# 381)** both the Court's Findings of Fact and Conclusions of Law **(# 351)** and the ensuing Judgment **(# 352)**, the SEC's response **(# 370)**, and Mr. Boyd's reply **(# 380)**.

### FACTS

Given the nature of the issues involved, the Court[2] will provide only a brief factual and

_____

[1] Finding merit in the SEC's contentions, and there being no objection, this motion is granted.

[2] The undersigned is the third district judge to preside in this case. Judge John L. Kane heard preliminary matters.  Judge Walker D. Miller presided through trial and issued the findings of fact and conclusions of law at issue. Shortly after the final ruling in this case was issued, Judge Miller took inactive senior status.  The undersigned reviews this matter solely on the

procedural summary here, and elaborate as necessary in its analysis.

The SEC commenced this action against Mr. Boyd (and numerous others) in December 1995.  The Complaint (**# 1**, as amended **# 82**) alleged that Mr. Boyd, primarily in conjunction with (and purporting to act as counsel on behalf of) Robert Wilson, engaged in a scheme to defraud victims into investing funds with Mr. Wilson, ostensibly for the purchase and trading of U.S. Treasury Securities.   The SEC contended that Mr. Wilson and Mr. Boyd (and others) made numerous false statements to investors about the status of their investments, when, in actuality, the men were allegedly diverting the investors' money to their own personal use.  The Complaint alleged two claims against Mr. Boyd: (i) securities fraud in violation of 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5; and (ii) securities fraud in violation of 15 U.S.C. § 77q.

On December 20, 1995, Judge Kane granted (**# 10**) the SEC's request for an *ex parte* Temporary Restraining Order, provisionally freezing the assets of Mr. Boyd, Mr. Wilson, certain others, and their related investment companies.  Judge Kane presided during a hearing on the SEC's request to convert that motion to a preliminary injunction, and on January 9, 2006, denied (**# 28**) that request as it related to Mr. Boyd.  In written findings, Judge Kane noted "an almost mythic display of imprudence" by Mr. Boyd with regard to his alleged conduct, but noted that the SEC had not come forward with sufficient evidence to suggest that such imprudent actions amounted to a violation of law, nor shown that Mr. Boyd was secreting assets.[3]

Mr. Boyd sought (**# 92**) dismissal of the claims against him, but Judge Miller denied that

record.

[3]Mr. Boyd's instant motion also draws the Court's attention to an observation by Judge Kane that he was "very troubled" by a "gross[ly] inaccur[ate]" press release the SEC had issued upon the issuance of the Temporary Restraining Order.

motion  **(#210)**, and the case against Mr. Boyd proceeded to a bench trial on November 6, 2000 **(# 293)**.  Presentation of evidence occurred over nine days of trial, concluding on November 29, 2000.  At that time, Judge Miller took the matter under advisement **(# 304)**.  Through December 2000 and into mid-2001, the parties filed a variety of post-trial motions, mostly concerning the admissibility of certain evidence adduced at trial, and various iterations of proposed findings of fact.  Judge Miller resolved all of these matters by March 2002, and with the exception of the parties briefly addressing new authority in January 2003, the docket reflects  no other activity in the case for some eight and a half years.

On July 6, 2011, Judge Miller directed the parties to file copies of the exhibits admitted at trial.  The parties filed their exhibits by July 19, 2011, and on July 22, 2011, Judge Miller issued Findings of Fact and Conclusions of Law **(# 351)**, finding in favor of the SEC and against Mr. Boyd on all claims.  A Judgment **(# 352)** in favor of the SEC followed.

Mr. Boyd now moves **(# 359)** to set aside those Findings of Fact and the Judgment, arguing: (i) the delay in issuing the Findings of Fact violated Mr. Boyd's Due Process rights which warrants dismissal of the claims and/or denial of any equitable relief against him; (ii) the permanent injunction entered by the Court was unwarranted, as the conduct at issue occurred in 1994 and 1995 and there was no allegation that Mr. Boyd had continued to violate securities laws since then; (iii) the order requiring Mr. Boyd to disgorge some $ 685,000 was unwarranted, insofar as the funds reflected in that order were neither profits nor causally related to the violation; (iv) the finding that Mr. Boyd committed securities fraud was legally erroneous, as Mr. Boyd cannot be held primarily liable when, as an attorney, he merely prepared documents for a client; (v) the Court misapplied the "in connection with" element, insofar as actions after an

investment decision has been made cannot constitute securities fraud; (vi) the Court failed to recognize that, as an attorney representing Mr. Wilson and his entities, Mr. Boyd cannot be held liable for omissions he makes in speaking to others; (vii) the Court erred in finding that statements Mr. Boyd made to non-investors could nevertheless give rise to liability if those statements could foreseeably find their way into the hands of investors; and (viii) the Court made certain erroneous evidentiary rulings.

## ANALYSIS

### A.  Due Process

The Court begins with Mr. Boyd's contention that the eight and one-half year delay in the issuance of a ruling in this matter[4] deprived him of Due Process.

Mr. Boyd argues that the factors articulated in *U.S. v. $8,850*, 461 U.S. 555, 564-65 (1983), which, in turn, are derived from *Barker v. Wingo*, 407 U.S. 514 (1972), control the inquiry into when delay in resolution of a case amounts to a Due Process deprivation.  The SEC argues that *U.S. v. Lovasco*, 431 U.S. 783, 789 (1977) provides the proper factors to be considered.

The Court has reviewed all of the cases cited by both parties, and having done so, concludes that none of these cases resolve the issue presented.  Nearly all of these cases involve delay in <u>initiation</u> or <u>prosecution</u> of an action by one of the parties.[5]  Only a handful deal with

---

[4] The Findings of Fact and Conclusions of Law explain the delay as resulting in part from "the press of other court business" and "extensive filings" by the parties.

[5] Some cases cited by the parties, such as *Harris v. Champion*, 15 F.3d 1538 (10th Cir. 1994), involved systematic delay by overworked public defenders, rather than prosecutors, but this does not change the analysis.

adjudicative delay, where both parties are (relatively) free of fault.  Of these cases, most are criminal cases where the constitutional guarantee of a speedy trial is operative.  *See e.g. U.S. v. Ray*, 578 F.3d 184 (2d Cir. 2009) (15-year delay in re-sentencing defendant after remand); *Burkett v. Cunningham*, 826 F.2d 1208 (3d Cir. 1987) (5½-year delay in sentencing defendant following conviction, among others).  Only one of the cited cases involves delay in adjudication of civil litigation, and there, the court acknowledged the absence of "any decision recognizing a right to judicial determination of a civil claim within a prescribed period of time as an element of such right" and that "we can find no basis in the Constitution for a rigid right to resolution of all civil claims within such a time frame."  *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 706 (9th Cir. 1992).

Mr. Boyd argues that, although this case is postured as a civil dispute, the fact that the SEC – a government agency – is pursuing claims of fraud against him and seeking non-compensatory penalties renders this case less like a garden variety civil dispute (such as an action for breach of contract) and more like a quasi-criminal prosecution.  Without passing on the merit of such an argument, the Court finds that even if there a right to have an adjudication within a specific time period, and such right rose to the level of a Constitutional right, there is no justification for the requested remedy of dismissal.

In this regard, *Ray* is particularly instructive.  There, the defendant was convicted of a fraud charge in 1991 and sentenced in 1992.  A change in the governing law during the appeal of her sentence prompted the parties to agree to remand the matter to the District Court for resentencing, and in early 1993, the Court of Appeals issued a mandate directing such resentencing.  As the Second Circuit explains, "[f]or unknown reasons, no further action was

taken on Ray's case for fifteen years." *Id.* at 187.  A request by the defendant in 2007 for documentation disclosing the disposition of her case prompted the District Court to immediately set the matter for resentencing.  At that resentencing, the defendant requested that her conviction be vacated and the charges dismissed due to Speedy Trial violations, but the trial court refused and sentenced her to a period of supervised release, coupled with a six-month stay in a halfway house.

In hearing an appeal from the resentencing, the Second Circuit first concluded that the defendant's constitutional right to a speedy trial was not violated because it did not consider imposition of sentence to be a stage of the case to which that constitutional right applied.  *Id.* at 191-200.  It then observed that the Fifth Amendment's Due Process clause "has a limited role to play in protecting against oppressive delay."  *Id.* at 199.  Relying primarily on *Lovasco* (a case addressing pre-indictment investigative delay), it concluded that the relevant Due Process analysis required consideration of two factors: (i) the reasons for the delay; and (ii) the prejudice to the accused.  *Id.*  Turning to the factor of reasons for the delay, the Second Circuit observed that "Ray's case was allowed to languish due to ordinary negligence on the part of the government," by which it appears to mean the prosecution.  *Id.* at 200.  (The District Court itself appears to escape criticism.)  The Court ascribed some fault to the defendant, but only in a conditional sense: "to the extent the defendant is seeking not to vacate her conviction by reason of the delay but seeking rather a modification of the terms of her sentence . . ., we see no reason to impose blame, fault, or responsibility on her for the delay," but "to the extent she seeks in this appeal to have her conviction vacated and the indictment dismissed, her failure, or her attorney's failure, to seek more prompt sentencing weighs heavily against her."  *Id.*  With regard to the

6

prejudice question, the court found that in the intervening 15 years, the defendant "has undergone what appears to be a complete rehabilitation," obtaining an education and building a family and career. *Id.* at 201. Finding that requiring her to spend time in a halfway house now would be an unwarranted disruption of her now law-abiding life, the court concluded that this factor "would seriously prejudice Ray and weighs heavily against the Government." *Id.* Thus, the court concluded that the delay violated the defendant's Due Process rights, but found that the appropriate remedy was one which vacated the remainder of any sentence imposed upon her, but not one that relieved her of culpability for the underlying criminal conduct, such that dismissal of the charges against her was warranted. *Id.* at 202-03.

Ray provides a very helpful template for addressing Mr. Boyd's complaints of undue delay in this case. It is a criminal case where constitutional Due Process rights were recognized, but not overridden by application of the Speedy Trial Act. Assuming – without necessarily finding – that Mr. Boyd's Due Process rights under the Fifth Amendment might be implicated by the delay in adjudication in this case, the appropriate analysis requires consideration of the degree to which each party is responsible for (or could have acted to remedy) the delay and any demonstrable prejudice that Mr. Boyd has suffered.

In *Ray*, the court found that "it is not the defendant's duty . . . to see that she is speedily prosecuted and sentenced," 578 F.3d at 200, and presumably, Mr. Boyd would argue that he was similarly under no obligation to hasten Judge Miller's consideration of the SEC's "prosecution" against him. This Court has some doubt that Mr. Boyd's interests in this regard are necessarily

coterminus with the defendant's in *Ray*,[6] but assuming they are, a similar analysis is appropriate: to the extent Mr. Boyd seeks dismissal of the claims against him, his failure to seek to hasten the decision weighs heavily against him, but to the extent he seeks only to ensure that any penalty imposed upon him takes into account his apparent law-abiding conduct in the years since the case was submitted, this Court would be inclined to hold him blameless.[7]

Turning to the question of prejudice that Mr. Boyd has suffered as a result of the delay (or, in context of *Ray*'s analysis, the prejudice he would suffer if the full scope of the punishment imposed against him by the Judgment were to be applied), Mr. Boyd does not present as compelling a case as the defendant in *Ray*.  Ms. Ray faced the obligation to leave her home and family and spend six months residing in a closely-supervised halfway house, suffering a variety of inconveniences, all for the nominal purpose of facilitating a rehabilitation that, all agreed, had already occurred.  By contrast, the Judgment against Mr. Boyd has three components, none of which are  implicated by the delay in resolution of his case: (i) a disgorgement order; (ii) imposition of a monetary penalty; and (iii) entry of an injunction against him.  Mr. Boyd can

---

[6]This Court is somewhat flummoxed as to why, after the passage of some reasonable number of years without apparent action, neither party requested advisement regarding the status of the matter, moved for expedited consideration of the case or sought to compel issuance of a ruling through a request to the 10th Circuit for a writ of mandamus.  The Court can only assume that the parties' inaction reflects the fact that neither party felt particularly prejudiced by the lack of a prompt determination of the matter.

[7] *Ray* seems to draw less on case precedent and more on a sort of common-sense wisdom – that is, that the delay in resentencing the defendant might inform the concerns of punishment and rehabilitation that are at the core of the sentencing process, but do not vitiate the unlawfulness of the underlying conduct for purposes of dismissal of the charges.   By this measure, the same wisdom is present here: Judge Miller's delay does not make Mr. Boyd's commission of securities fraud violations less culpable, such that dismissal of the claims is appropriate, but that delay might well inform the question of what punishment should be imposed for those violations this long after the fact.

hardly complain that the disgorgement order or imposition of a fine, coming some ten years after the presentation of evidence against him, became more prejudicial because of the delay.  The disgorgement order was based on evidence in the record as of 2000, and the cumulative effect of ten years of delay actually benefits Mr. Boyd from an economic perspective - he has had the use of the sums subject to disgorgement for ten years.[8]

The imposition of an injunction against Mr. Boyd is the closest analog to the halfway house sentence imposed on the defendant in *Ray*.  As discussed below, the injunction imposed here is a standard injunction sought by the SEC in all securities fraud cases, permanently enjoining Mr. Boyd against future violations of securities laws.  The Court cannot say that the delay in the issuance of this injunction caused Mr. Boyd any particular prejudice.[9]  If anything, the delay has benefitted him by allowing him nearly a decade during which he was unencumbered by an injunction that would otherwise have been imposed earlier.   Unlike the Defendant in Ray, however, the prohibitory injunction imposed against Mr. Boyd does not require him to do anything or remove him from his ongoing life and activities.  Indeed, Mr. Boyd contends that he long ago ceased any behavior that is subject to the injunction, making it unclear how the delay in issuing that injunction works any prejudice upon him.

As noted earlier, it is not necessary at this juncture to dispositively adjudicate whether the delay in issuance of the Findings and Judgment amount to a deprivation of Mr. Boyd's Due

---

[8] There is nothing in the record that suggests that the final judgment reflected some increase in the disgorged sum to reflect its present value or the interest that could have been earned on it.

[9] Mr. Boyd has separately challenged the propriety of that injunction on other grounds as well, a challenge the Court addresses on its merits, *infra.*

Process rights because the remedy for such injury would not result in dismissal of his claims. Applying the balancing of the factors discussed in *Ray*, it does not appear that there has been such significant  prejudice to Mr. Boyd due to the delay in issuance of a final determination of this matter that outright dismissal of the SEC's claims against him is warranted.  In that respect, then, Mr. Boyd's motion is denied.  Nevertheless, consistent with *Ray*, the Court will examine the propriety of the relief imposed against Mr. Boyd mindful of the passage of time that has occurred.

### B.  Evidentiary rulings

Logically, the Court's next task is to address any challenges by Mr. Boyd to the evidentiary rulings made (or, arguably, not made) at trial, as those rulings, in turn, dictate the evidence that may be relied upon in finding facts and applying law.

Mr. Boyd contends that Judge Miller erred in excluding testimony by Mr. Boyd's admittedly late-disclosed expert.  Mr. Boyd's challenge to that ruling appears to be limited to arguing that "any efficiency reasons that could have justified the exclusionary rulings . . . lose force given that the Court did not ultimately decide the case for more than a decade."[10]  This Court finds no merit in such *post hoc* reasoning.

The trial record indicates that Mr. Boyd attempted to call the expert as part of his defense case on November 27, 2000, the penultimate day of trial.  When the SEC objected, Mr. Boyd acknowledged that he first notified the SEC of his intention to call the expert in October 2000,

---

[10]Mr. Boyd cites to his own affidavit that seems to offer a different argument – that a several year delay between the time for designating witnesses and the commencement of trial belied the ostensible reasons of efficiency that justified Judge Miller's exclusion of the expert. Because Mr. Boyd does not present this argument in his brief, the Court does not consider it.

less than a month before trial began (and then only by listing him as a "may call" witness on Mr. Boyd's witness list), and Mr. Boyd made no disclosure of the necessary material required by Fed. R. Civ. P. 26(a)(2).  After hearing argument on the issue, Judge Miller excluded the expert for several reasons, including: (i) the belief that the expert's proffered opinions might be inadmissible under *Specht v. Jensen,* 853 F.2d 805 (10th Cir. 1988); (ii) Mr. Boyd's disclosure of the expert's qualifications, publications, compensation, and various other matters required by Rule 26 remained inadequate, even as of that very day; and (iii) "to permit expert evidence to come in in that fashion without affording the review analysis, discovery and the possibility of countervailing expertise being developed by the other side is just simply inconsistent with the well-established rules which require these disclosures."  Even assuming this third reason is understood as a finding that concerns of trial efficiency did not justify delaying the trial to permit Mr. Boyd to make a late disclosure of the expert and to permit the SEC to respond accordingly, that ruling was simply a recognition that the trial had already commenced – and indeed, was nearing its conclusion – and that disruption of the trial proceedings militated against allowing the late designation.   The propriety of an evidentiary ruling must be assessed in light of the facts that existed at the time it was made, not based on future events that could not have been known or anticipated by the Court at the time of the ruling. Accordingly, this challenge by Mr. Boyd is without merit.

Next, Mr. Boyd argues that certain objections by the parties to admission of deposition testimony were never resolved by Judge Miller, leaving "the parties [to] only guess which depositions or parts of depositions the Court considered."  The Court declines to address this argument in detail, other than to observe that the parties' briefing on the instant motion does not

challenge the sufficiency of any of Judge Miller's Findings of Fact - in other words, neither side alleges contends that Judge Miller's findings are not supported by the evidence in the record or that supplemental findings should have been made.  Thus, the question of what evidence Judge Miller relied upon to reach those findings is irrelevant.  Accordingly, the Court finds that no modification of the Findings or Judgment are warranted on this ground.

Finally, Mr. Boyd makes a perfunctory argument that "much of the Court's finding involved Boyd wiring monies from his trust account, as directed by his client Wilson, to pay Wilson's bills and expenses," but that such money "legally belonged to Wilson [and] there was no evidence that Boyd ever agreed that the money would be kept in his attorney trust account even after the stock was purchased from Wilson."  Other than citing to Judge Miller's Findings of Fact, Mr. Boyd offers no citation to the record in support of this contention, nor any material argument as to how such a contention is relevant and probative of the substantive issues. Without a more developed argument on this point, the Court finds no basis for relief.

### C.  Violation of securities laws

Having found no errors in the composition of the factual record, the Court then turns to Mr. Boyd's challenges to the Conclusions of Law.  (As noted above, Mr. Boyd does not challenge any of the Findings of Fact themselves, and thus, the Court will ascertain whether the law, as applied to those found facts, establishes the substantive claim(s) of securities fraud.)

To establish a claim of securities fraud under either of the cited statutes, the SEC was required to show: (i) Mr. Boyd made a material misrepresentation; (ii) in connection with the purchase or sale of securities; (iii) with appropriate scienter; and (iv) using the requisite jurisdictional means.  *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1178 (10th Cir. 2006).  Mr. Boyd

alleges that Judge Miller committed error with regard to the first two elements.

With regard to whether Mr. Boyd made a material misrepresentation, Mr. Boyd argues that Judge Miller erred in finding that "as an attorney, [he] is not exempt from the reach of the securities laws," insofar as "an attorney who prepares a dishonest statement is a primary participant even though someone else may conduct the personal negotiations with a security purchaser." Mr. Boyd argues that this conclusion is erroneous in light of *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2011). *Janus* stands for the proposition that "the maker of a [false] statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it . . . [o]n e who prepares or publishes a statement on behalf of anther is not its maker." *Id.*

Judge Miller's findings are not *per se* inconsistent with the reasoning in *Janus*. Under *Janus,* an attorney who prepares a false statement to be disseminated to investors can be liable for the contents of that statement if <u>the attorney</u> has the ultimate authority over the contents and dissemination of the statement, but not where the attorney is simply preparing the statement at the direction of a client who is controlling the contents of that statement.

It is not entirely clear how Mr. Boyd seeks to apply these principles to the Findings of Fact. He argues that "much of the discussion of Boyd's alleged defrauding of [investor] NFC focused on notes and other documents that he 'drafted' or 'prepared,'" and that "the Court faulted Boyd for following Wilson's instructions in disbursing monies sent by NFC . . . to his trust account." He goes on to contend that "those disbursements could not have violated securities laws unless Boyd was primarily liable for having fraudulently induced the investment decisions," even though "he could not have primary liability for simply preparing investment

13

documents."

Mr. Boyd's  arguments are inconsistent with what Judge Miller actually found.  In paragraph 6 of the Conclusions of Law, Judge Miller found that Mr. Boyd made two false statements to NFC - that money securing its proposed investment would be safe in his attorney trust account and that Mr. Wilson was a legitimate businessman with the means to cover rescission of investments.  There is no indication that Mr. Boyd merely "prepared" these statements at someone else's direction; rather, it is clear that Mr. Boyd was the person controlling the making and content of these statements.   Thus, even under *Janus*, Mr. Boyd can be held liable as the "maker" of these false statements.  The fact that Judge Miller's Findings of Fact also reference situations in which Mr. Boyd prepared certain documents under the direction of Mr. Wilson or others is irrelevant, as Judge Miller's findings that Mr. Boyd violated securities laws were not premised on the documents he merely prepared.

Mr. Boyd also argues that Judge Miller failed to recognize that, as an attorney representing Mr. Wilson and his entities, Mr. Boyd cannot be held liable for certain omissions he makes in speaking to others.  He acknowledges Judge Miller's conclusion that he is obligated to "provide complete and nonmisleading information with respect to subjects on which he undertakes to speak," but argues that he is not obligated to disclose adverse action collateral to subjects on which he speaks – *e.g.* speaking on "funds paid to an attorney trust account does not impose a duty to disclose the client's financial circumstances."  Once again, Mr. Boyd's argument quibbles with certain findings that are not central to Judge Miller's Conclusions of Law.  Mr. Boyd argues that Judge Miller's finding that he defrauded investor Bok Pon was based on the fact that Mr. Boyd "did not tell [Mr.] Pon of his own problems with the investment" in the

company in question.  Although Judge Miller did find that Mr. Boyd did not disclose such information, that is not the basis of Judge Miller's Conclusions of Law.  Instead, those Conclusions find that Mr. Boyd defrauded Mr. Pon by falsely stating to Mr. Pon that Mr. Boyd was a trustee of certain investor funds when, in fact, he was not and that he failed to disclose to Mr. Pon that investor funds were not being invested as promised.  With regard to the affirmative misrepresentation to Mr. Pon about acting as trustee of the funds, Mr. Boyd's arguments concerning his liability for omissions is irrelevant; with regard to Mr. Boyd's omissions in acknowledging to investors that their monies were not being invested as represented, this purpose for which funds were being invested was a subject on which Mr. Boyd had specifically undertaken to speak to investors, and thus, his failure to correct the investors' misleading impressions that the funds would be invested as Mr. Boyd had represented was actionable.

Mr. Boyd also argues that Judge Miller erred in finding that statements Mr. Boyd made to non-investors could give rise to liability if those statements could foreseeably find their way into the hands of investors.  This argument appears to relate to a Conclusion of Law by Judge Miller that, among Mr. Boyd's false representations was his statement in a letter to Don Edel that one of Mr. Wilson's companies was secured by some $61 million in securities that were being held by Mr. Boyd.  Mr. Boyd does not dispute the general proposition cited by Judge Miller – that a person may be liable for a false statement made to a non-investor if that statement could foreseeably come into the hands of and induce an investor – but Mr. Boyd argues that there was no evidence in the record that he wrote to Mr. Edel seeking to induce an investment from him, much less that he could have foreseen that Mr. Edel would thereafter distribute that letter to other investors.

15

Based on this Court's review of the record, that argument is largely correct: the only person to testify as to the circumstances of Mr. Boyd writing to Mr. Edel was Mr. Boyd himself, who stated that he believed he was conveying information to Mr. Edel in conjunction with a job offer that Mr. Wilson was making, and the circumstances by which that letter later found its way into the hands of other investors are unclear.  But even if correct, this argument is of little effect. Although Judge Miller's Conclusions of Law find that Mr. Boyd made a false statement to Mr. Edel in the letter, those Conclusions do not go on to find that misrepresentation was made in conjunction with the sale of securities, and thus, do not conclude that the statement made to Mr. Edel was an actionable instance of securities fraud; when addressing that element in paragraph 8 of his Conclusions of Law, Judge Miller does not mention the statement to Mr. Edel.[11]

Finally, Mr. Boyd argues that Judge Miller erred in finding that Mr. Boyd's false statements were made "in conjunction with the purchase or sale of securities."  Specifically, he argues that false statements made to investors <u>after</u> an investment decision has been made – such as statements encouraging the investors to forego demanding rescission or to delay commencing litigation – are not actionable.  Mr. Boyd makes this argument in conjunction with the fact that four pages of Judge Miller's Findings of Fact discus the investment of John DiFrances, whom Mr. Boyd contends invested with Mr. Wilson prior to any alleged false statements by Mr. Boyd.

---

[11]The SEC's response to Mr. Boyd's motion appears to assume that Mr. Boyd makes this argument with regard to the fact that Mr. Pon obtained a copy of the Edel letter, and that Mr. Pon relied in part upon that letter in electing to invest.  But Judge Miller's Findings of Fact and the record itself make clear that Mr. Pon did not simply rely upon the representations in the letter in electing to invest; instead, Mr. Pon spoke directly to Mr. Boyd, who (falsely) confirmed that he would act as trustee, holding the funds to ensure that Mr. Pon's investment would be secured. Thus, even though Mr. Boyd might not be liable for Mr. Pon's reliance on false statements in the letter, his is liable for his false statements made directly to Mr. Pon.

As discussed above, Judge Miller made factual findings with regard to statements that Mr. Boyd made to Mr. DiFrances, but the Conclusions of Law give no indication that Judge Miller found that those statements was made "in conjunction with" a securities transaction.  Accordingly, this Court cannot say that Judge Miller's Conclusions of Law on the "in connection with" issue are in error.

Mr. Boyd also argues that Judge Miller erred in his findings that false statements to two investors were indeed made "in connection with" the purchase of securities.  With regard to investor Monte Lund, Mr. Boyd argues that Judge Miller found that the transaction involving Mr. Lund was not Mr. Lund investing in Tri-Northern, but rather, Mr. Lund loaning money to Mr. Boyd so that Mr. Boyd could invest in Tri-Northern.  In large part, Mr. Boyd is correct – paragraphs 33-50 of the Findings of Fact discuss Mr. Boyd's interactions with Mr. Lund, and nearly every paragraph of that discussion does indeed relate to Mr. Lund loaning Mr. Boyd money so that Mr. Boyd could invest in Tri-Northern.  However, paragraphs 40 and 50 make reference to "Lund's own investment in Tri-Northern stock" in the amount of $ 135,000, and that Mr. Lund lost that investment when the scheme collapsed.  Arguably, Mr. Lund's enthusiasm for the stock appears to have derived from Mr. Boyd's own personal investment in it, and the Court would be reluctant to find that Mr. Boyd discussing his own investment strategies with Mr. Lund for the purpose of obtaining a personal loan to effectuate those strategies would constitute a misrepresentation designed to induce Mr. Lund into purchasing the stock.  But the record also discloses that Mr. Boyd made certain false representations to Mr. Lund in conjunction with Mr. Lund's own decision to invest, such as in a joint telephone call with Mr. Wilson in which Mr. Boyd represented that Tri-Northern stock would begin trading publicly on a certain date.  Thus,

17

Judge Miller's conclusion that Mr. Boyd made false representations to Mr. Lund in connection with the purchase or sale of securities is correct.

Mr. Boyd also challenges Judge Miller's conclusion that he made false representations to investors NFC and Sandra Erwin in connection with the sale of securities.  Mr. Boyd contends that the evidence at trial reveals that the NFC/Erwin "investment" was a loan to Mr. Wilson, not an investment by NFC/Erwin in securities.  Judge Miller found that the NFC investment was "a complicated scheme in which NFC would deposit money into an account held by Boyd as trustee for . . . a Wilson-controlled company [and that] Wilson would then collateralize the funds with U.S. Treasuries and leverage and trade the treasuries to make a profit to be shared by NFC and Wilson."  Regardless of how the transaction was layered, it is clear that NFC was investing in securities that Wilson would trade, and thus, this Court finds no error in Judge Miller's Findings and Conclusions on this point.

### D.  Remedy

Having concluded that Judge Miller correctly found for the SEC on its securities fraud claims against Mr. Boyd, the Court turns to Mr. Boyd's challenges to the remedies imposed  – namely, a permanent injunction and a disgorgement order.  (The Court does not understand Mr. Boyd to challenge the $ 50,000 penalty.)

Turning first to the disgorgement order, such orders are issued with regard to profits illegally obtained by a defendant as the result of a fraudulent scheme.  *SEC v. Cavanaugh*, 445 F.3d 105, 116 (2d Cir. 2006).  Rather than being remedial or punitive, disgorgement is an equitable remedy designed to deter fraudulent conduct by depriving the defendant of the unjust enrichment he obtained through the scheme.  *Id.* at 117.

18

The disgorgement order had two components, both of which Mr. Boyd contends were erroneous: (i) $ 400,000 that Mr. Wilson paid to Mr. Lund in satisfaction of a loan that Mr. Lund had extended to Mr. Boyd to permit Mr. Boyd to purchase Tri-Nothern stock; and (ii) $ 285,000, reflecting the value of Mr. Boyd's home mortgage, which Mr. Wilson purchased from the bank and, apparently, forgave insofar as Mr. Boyd never made further payments on it.  This Court finds both elements of the disgorgement order to be problematic.

With regard to the $ 400,000 repayment of the loan from Mr. Lund, the Findings of Fact reflect that Mr. Boyd took out two $ 400,000 loans from Mr. Lund, each composed of $ 300,000 in principal plus a $ 100,000 lender premium.  These were for the purpose of purchasing Tri-Northern stock.  Mr. Boyd obtained 200,000 shares of Tri-Northern with the proceeds of these loans.  Later, Mr. Wilson "unwound" the first loan, taking back 100,000 shares of Tri-Northern from Mr. Boyd and repaying $ 400,000 to Mr. Lund.  The record reflects that Mr. Wilson also unwound an undisclosed portion of the second loan, taking back "a percentage" of the stock (leaving Mr. Boyd "a good amount" of Tri-Northern stock), and paying back "a part" of the loan from Mr. Lund.

On this record, the Court cannot conclude that a $ 400,000 disgorgement order is appropriate.  Judge Miller premised this portion of the disgorgement order on the fact that Mr. Wilson "provided a $ 400,000 direct benefit to Boyd by paying Boyd's loan due [to] Lund."  But Judge Miller made no findings as to how that repayment constituted profits or enrichment to Mr. Boyd, much less profits or enrichment that are traceable to Mr. Boyd's participation in the fraudulent scheme.  Judge Miller's own findings reflect that the $ 400,000 loan was taken by Mr. Boyd to purchase 100,000 shares of Tri-Northern, and that when Mr. Wilson "rescinded" that

transaction, he "repa[id] $ 400,000 to . . . Lund and [took] back the first 1000,000 [Tri-Northern] shares purchased." Thus, Mr. Boyd received no benefit from Mr. Wilson's repayment of the loan, as he surrendered the Tri-Northern stock related to that loan to Mr. Wilson in exchange for the repayment. At the conclusion of this transaction, Mr. Boyd was simply restored to the point he was at before any of the relevant events occurred – he owed nothing to either Mr. Lund or Mr. Wilson, and he had no corresponding shares of Tri-Northern. Accordingly, there was no unjust enrichment to Mr. Boyd to be disgorged as a result of Mr. Wilson's repayment of the loan.[12]

With regard to the mortgage, Judge Miller found that Mr. Boyd began performing legal work for Mr. Wilson under a retainer agreement as of February 1994. In April 1994, Mr. Wilson purchased the outstanding $ 285,000 note on Mr. Boyd's home, and the record appears to reflect that Mr. Boyd never made any further payments on the note, to Mr. Wilson or otherwise. The various fraudulent investment schemes that Mr. Boyd assisted Mr. Wilson in perpetrating began in or about April 1994. From these facts, Judge Miller apparently concluded that Mr. Wilson's purchase (and apparent forgiveness) of Mr. Boyd's mortgage was enrichment of Mr. Boyd as the result of the scheme, such that disgorgement of the outstanding principal amount of that mortgage at the time of Mr. Wilson's purchase is appropriate. This Court disagrees. Judge Miller made no findings to support the conclusion that Mr. Wilson's purchase of the mortgage was payment or a reward to Mr. Boyd for his participation in the schemes, as opposed to, say, a reward to Mr. Boyd for legitimate legal work he provided to Mr. Wilson or even an investment by Mr. Wilson that he later neglected or abandoned. Judge Miller's Conclusions of Law state

---

[12]The Court need not reach the question of whether the repayment of a loan which Mr. Boyd used to acquire Tri-Northern stock for himself would be subject to a disgorgement order based on fraudulent statements he made to induce others' investment.

nothing more than "as part of the ongoing relationship between Wilson and Boyd, Wilson provided Boyd a $ 285,000 direct benefit."  But that Conclusion does not address the particular "relationship" at issue, and there were a variety of relationships between Mr. Boyd and Mr. Wilson disclosed in the record – attorney/client, investor/investee, co-fraudsters, etc.  Without a finding that justifies the conclusion that Mr. Wilson purchased and forgave Mr. Boyd's mortgage as some form of compensation for his assistance in the fraudulent scheme, rather than for some other reason, there is no support for the disgorgement order in this amount.

Judge Miller specifically found that there was no other evidence supporting disgorgement of other funds obtained by Mr. Boyd through the conduct at issue here.  Because the Court finds that the record is insufficient to support disgorgement of the $ 285,000 and $ 400,000 sums, the Court sets aside the disgorgement order in its entirety.

Finally, Mr. Boyd contends that Judge Miller erred in issuing a permanent injunction against him.  That injunction, standard in securities cases, simply prohibits Mr. Boyd from violating securities laws in the future.[13]  Mr. Boyd argues that such injunctions are intended to prevent future violations, and given the passage of time – some 15 years – since the conduct at issue here without any allegations of additional misconduct by Mr. Boyd, the injunction is unwarranted.  An injunction is warranted where the SEC shows a reasonable likelihood that a defendant would violate securities laws in the future.  *SEC v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004).  Among the factors to be considered in determining whether this standard is met

---

[13]The effectiveness of such injunctions is a matter of considerable dispute.  On the one hand, Mr. Boyd cites to several cases in which courts warn of the dire, oppressive effect of such injunctions.  On the other hand, cases like *SEC v. Smyth*, 420 F.3d 1225, 1233 n. 14 (5th Cir. 2005) deem them to be so vague as to be unenforceable.  *See also SEC v. Sky Way Global, LLC*, 710 F.Supp.2d 1274, 1280 (M.D.Fl. 2010) (elaborating on *Smyth*).

are: (i) the egregiousness of the defendant's actions; (ii) the isolated or recurrent nature of the

infraction; (iii) the degree of scienter involved; (iv) the sincerity of the defendant's assurances

against future violations; (v) the defendant's recognition of the wrongful nature of his conduct;

and (vi) the likelihood that the defendant's occupation will present opportunities for future

violations.  *Id.*  Judge Miller made findings as to each of these factors, finding all of them to tip

in favor of granting an injunction.

Mr. Boyd's only argument on this point is that, given the passage of extended time since

the violations and the (apparent) fact that he has not committed any violations since then, the

Court should find that there is no reasonable likelihood that he will engage in future violations

and thus deny any injunction.

Although this Court is somewhat sympathetic to the argument that, if Mr. Boyd truly

intended to engage in further fraud, he would have done so during the past 15 years, that

rationale is not ironclad.  One might also reasonably argue that it was the pendency of the

decision in this case that truly served to deter Mr. Boyd from future violations, or that future

violations become more likely if the penalties resulting from this case (particularly in light if the

instant ruling) are comparatively light.  Ultimately, the Court cannot say that Judge Miller's

findings as to each of the relevant factors are in any way incorrect, and that taken as a whole,

they do favor the grant of injunctive relief.[14]

---

[14]At the same time, this Court formally notes its skepticism as to the value of the SEC's
standard "obey the law" injunction.  The court's decision in *SEC v. Sky Way Global, LLC*, 710
F.Supp.2d 1274, 1280 (M.D.Fl. 2010), addresses the issue in comprehensive depth, ultimately
concluding that such injunctions raise serious legal and constitutional questions and have little to
no actual deterrent effect.  Although the Court grants the injunctive relief requested by the SEC,
it does so with the caveat that if enforcement of that injunction is later sought from this Court,
the Court intends to narrowly construe and apply the terms of that injunction so as to minimize

## CONCLUSION

For the foregoing reasons, the SEC's Motion to Amend Judgment (**# 354**) is **GRANTED**, and the Judgement (**# 352**) is **DEEMED AMENDED** to omit the material identified in that motion. Defendant Boyd's Motion to Vacate (**# 359,** as modified **# 381**) is **GRANTED IN PART**, insofar as the Court **VACATES** that portion of the Findings of Fact and Conclusions of Law (**# 351**) and the ensuing Judgment (**# 352**) that impose a disgorgement remedy on Mr. Boyd, and **DENIED IN PART** in all other respects.

Dated this 29th day of March, 2012

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge

---

the concerns raised in cases such as *Sky Way Global*. In other words, the Court will use its contempt power to enforce the injunction only upon a showing that a future alleged violation by Mr. Boyd utilized essentially the same fraudulent means, targeted essentially the same class of victims, and entailed a substantial connection to Colorado; alleged violations that do not hew extremely closely to the facts of this case will have to be pursued by the SEC through normal litigation rather than via contempt.